Approved: _____                               20 MJ 8578
          T. JOSIAH PERTZ
          Assistant United States Attorney

Before:   THE HONORABLE PAUL E. DAVISON
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - - X
                                  :   **COMPLAINT**

UNITED STATES OF AMERICA      :

                                  :   Violations of 18 U.S.C.
          - v. -              :   §§ 1956 and 2; 21 U.S.C.
                                       § 846
                                  :
FIEDEL BAUTISTA, and        :   COUNTIES OF OFFENSE:
RAMON PORTES,               :
                                  :   BRONX AND WESTCHESTER
                Defendants.  :
                                  :
- - - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

       JOHN J. KERWICK, being duly sworn, deposes and says that he is a Task Force Officer with the Drug Enforcement Administration ("DEA"), and charges as follows:

**COUNT ONE**
(Money Laundering Conspiracy)

       1.   From at least in or about July 2020 to on or about August 8, 2020, in the Southern District of New York and elsewhere, FIEDEL BAUTISTA and RAMON PORTES, the defendants, and others known and unknown, willfully and knowingly, did combine, conspire, confederate and agree together and with each other to engage in monetary transactions in property derived from specified unlawful activity in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and (B)(i).

       2.   It was a part and object of the conspiracy that FIEDEL BAUTISTA and RAMON PORTES, the defendants, and others known and unknown, in an offense affecting interstate and foreign commerce, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, did conduct and attempt to conduct such a financial transaction, which in fact involved the proceeds of

specified unlawful activity with the intent to promote the carrying on of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

3. It was further a part and object of the conspiracy that FIEDEL BAUTISTA and RAMON PORTES, the defendants, and others known and unknown, in an offense affecting interstate and foreign commerce, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, did conduct and attempt to conduct such a financial transaction, which in fact involved the proceeds of specified unlawful activity knowing that the transaction was designed, in whole and in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Section 1956(h).)

## COUNT TWO
(Narcotics Conspiracy)

1. From at least in or about July 2020 to on or about August 12, 2020, in the Southern District of New York, RAMON PORTES, the defendant, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

2. It was a part and an object of the conspiracy that RAMON PORTES, the defendant, would and did possess with the intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1).

3. The controlled substances that RAMON PORTES, the defendant, conspired to distribute and possess with intent to distribute were 400 grams and more of mixtures and substances containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, commonly known as Fentanyl, 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, and 1 kilogram or more of a mixture and substance containing a detectable amount of heroin in violation of 21 U.S.C. § 841(b)(1)(A).

(Title 21, United States Code, Section 846; Title 18, United States Code, Section 2).

The bases for my knowledge and for the foregoing charges are, in part, as follows:

4.  I am a Task Force Officer with the DEA, and I have been involved in the investigation of the above-described offenses. This affidavit is based upon my personal participation in the investigation of this matter, as well as on my conversations with other law enforcement officers and others, and my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts I have learned during the investigation. Where the contents of documents or the actions, statements, or conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## AUGUST 12, 2020 SEIZURE

5.  Based on my discussions with other DEA agents, I have learned that, as part of a drug and money laundering investigation and pursuant to a warrant to conduct location-based monitoring, DEA agents have been conducting surveillance of a Toyota Camry with a particular license plate (the "Toyota Camry") in Westchester and Bronx Counties.

6.  I have reviewed DMV records, which show that the Toyota Camry is registered to "Feidel Bautista."

7.  On or about August 12, 2020, along with other DEA agents, I was conducting surveillance on the Toyota Camry. At approximately 11:15 a.m., the Toyota Camry stopped in the vicinity of a certain address on Morris Ave in the Bronx, New York (the "Morris Ave Address").

8.  A man later identified as RAMON PORTES, the defendant, exited the car from the passenger side, and entered the building at the Morris Ave Address (the "building"), carrying a red bag. FIEDEL BAUTISTA, the defendant, parked the Toyota Camry nearby and exited the vehicle. A few minutes later, PORTES exited the building, carrying a large black satchel (the "black satchel"), which appeared to be heavy, as well as the smaller red bag he had when he entered the building. PORTES walked over to where BAUTISTA was standing and handed BAUTISTA the black satchel. After receiving the bag, BAUTISTA entered the Toyota Camry with the black satchel, and drove off. Meanwhile, PORTES walked away down Morris Ave.

9. Another DEA Task Force Officer and I followed the Toyota Camry in our vehicle, and after a short distance, turned on our vehicle's siren to signal for FIEDEL BAUTISTA, the defendant, to pull over. Instead of pulling over, BAUTISTA drove away, and our vehicle pursued. The Toyota Camry made a left-hand turn at a red light and continued down Fordham Road into another intersection. Our vehicle overtook the Toyota Camry and blocked its forward path. The Toyota Camry then reversed, driving down Fordham Road a short distance, before driving forward onto the sidewalk. We maneuvered our vehicle such that it collided with the Toyota Camry at low speed to prevent its further movement down the sidewalk. The Toyota Camry came to rest, in the vicinity of a certain address on Fordham Road.

10. The other Task Force Officer and I parked our vehicle, approached the Toyota Camry and opened its door. Visible on the floor in front of the front passenger seat was the black satchel. The black satchel was partially open, and through the top I observed what appeared to be a bound bundle of U.S. currency. Law enforcement later took possession of the black satchel, and determined that it contained approximately $100,000 in cash. FIEDEL BAUTISTA, the defendant was taken into custody. BAUTISTA carried a New York State Driver's License in the name of "F J Bautista Castillo." His fingerprints matched an individual in the FBI database with the name FIEDEL J BAUTISTA.

LAW ENFORCEMENT'S INTERVIEW WITH PORTES

11. Based on my conversations with other DEA Agents, I learned the following:

a. Shortly after the Toyota Camry drove away from the Morris Ave Address with the black satchel, other DEA Agents with whom I am working approached RAMON PORTES, the defendant, on the sidewalk in the vicinity of the intersection of Grand Concourse and 184th Street, approximately two blocks from the Morris Ave Address.

b. PORTES voluntarily agreed to speak with the Agents, and stated, in substance and in part, that someone had told him to go to the Morris Ave Address to pick up money. He further stated that he had carried the black satchel that day, he knew it contained $100,000, he had passed it to another man on the street, and the money was the proceeds of narcotics transactions. PORTES understood that the money would eventually be sent to the bosses of the narcotics operation.

12. Based on my conversations with other DEA Agents, I learned that Agents placed RAMON PORTES, the defendant, under arrest. After he was taken into custody, PORTES waived his *Miranda* rights and agreed to be interviewed by law enforcement. He identified himself as RAMON PORTES and told law enforcement, in substance and in part, the following:

a. PORTES would periodically receive instructions from a man he knows as "Viejo," who lives in Mexico, where PORTES used to live. Viejo would tell PORTES where to pick up drug money and where to drop it off.

b. PORTES told law enforcement that, on roughly a weekly basis for several years, and at the direction of Viejo, he has arranged for the movement of money, which represents the proceeds of narcotics transactions. PORTES knew that the money was intended to reach individuals who would help launder the money. The amounts transferred were roughly the same each time, between $100,000 and $200,000. Through training and experience, I know that the street price of heroin and fentanyl is approximately $48,000-$60,000 per kilogram, and the street price of a kilogram of cocaine is approximately $35,000.

c. PORTES had picked up drug money in New York and Boston, Massachusetts, at Viejo's instruction, including in Westchester and Bronx Counties. He then transferred it to other individuals, and then on to others, for eventual delivery to Mexico. PORTES had given money to FIEDEL BAUTISTA, the defendant, several times before, each time in the range of $100,000 to $150,000. He understood the $100,000 he had given to BAUTISTA on or about August 12, 2020 was drug money destined for individuals who would launder it and send it to Mexico.

d. Viejo would also send PORTES instructions regarding the transportation of drugs. After having these conversations with the drug dealers, PORTES would inform drug couriers of the location of the drugs and instruct the couriers to unload the drugs and transport them to their intended destination so the drugs could be distributed to others.

e. PORTES told law enforcement that he had arranged for the transport of fentanyl, cocaine and heroin, at Viejo's direction. PORTES also stated that he had been involved in transferring multiple loads of drugs weighing multiple kilograms. He did that on many occasions over the course of many years.

## LAW ENFORCEMENT'S INTERVIEW WITH BAUTISTA

13. After he was taken into custody, FIEDEL BAUTISTA, the defendant, waived his *Miranda* rights and agreed to be interviewed by law enforcement. I participated in the interview. During the interview, he identified himself as FIEDEL BAUTISTA and told us, among other things, the following:

   a. BAUTISTA is employed as a driver for a ride-sharing service, but also uses his vehicle to make deliveries of money for drug dealers. He knew that the money was the proceeds of narcotics transactions. He said the drug dealers consider him reliable. He receives a couple hundred dollars for each delivery.

   b. BAUTISTA has dropped off money at locations in the Bronx, Queens, Manhattan, and Westchester County, among other places.

   c. BAUTISTA has worked with RAMON PORTES, the defendant, to conduct multiple drug-related financial transactions. Typically, before a transaction, PORTES would provide BAUTISTA with an address and phone number of a person to whom BAUTISTA would deliver money. PORTES would also send BAUTISTA a picture or text message with a serial number of a single dollar bill that the recipient would have. BAUTISTA would meet the intended recipient of the money, confirm that the recipient possessed the dollar bill with the serial number PORTES had sent, hand the recipient the money, and take the identifying dollar bill. BAUTISTA would then send the serial number of the dollar bill back to PORTES, who would send it to Viejo as confirmation that the transaction had occurred.

14. Based on my conversations with other DEA officers, I know that, after the arrest of FIEDEL BAUTISTA, the defendant, officers recovered a cellphone from BAUTISTA's person. BAUTISTA gave officers his consent to search the cellphone. I have reviewed messages stored on BAUTISTA's cellphone between BAUTISTA and another cellphone that BAUTISTA identified to me as belonging to RAMON PORTES, the defendant. Messages exchanged by BAUTISTA and PORTES contain images of serial numbers of dollar bills. Based on my training and experience, I know that individuals involved in money laundering commonly use this method to verify that they are conducting the transaction with the intended individual.

WHEREFORE, the deponent respectfully requests that FIEDEL BAUTISTA and RAMON PORTES, the defendants, be imprisoned or bailed, as the case may be.

    /s/ John J. Kerwick (credentials inspected)
JOHN J. KERWICK
Task Force Officer
Drug Enforcement Administration

Sworn to me through the transmission of this
Complaint by reliable electronic means, pursuant to
Federal Rule of Criminal Procedure 4.1, this

13th day of August, 2020  (via FaceTime)

THE HONORABLE PAUL E. DAVISON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK